IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2019

**STATE OF TENNESSEE v. GARY LEE BRAGG**

**Appeal from the Criminal Court for Knox County**
**No. 108446   Bob McGee, Judge**

**No. E2018-01789-CCA-R3-CD**

The Defendant, Gary Lee Bragg, was convicted by a Knox County Criminal Court jury of two counts of aggravated burglary, a Class C felony; possession of burglary tools, a Class A misdemeanor; and two counts of drug possession, a Class A misdemeanor. *See* T.C.A. § 39-14-403 (2018); 39-14-701 (2018), 39-17-418 (2018). The trial court sentenced the Defendant as a Range III, persistent offender to twelve years for each aggravated burglary conviction and to eleven months, twenty-nine days for each misdemeanor conviction. The court ordered consecutive service of the aggravated burglary sentences, for an effective twenty-four-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support one of the aggravated burglary convictions and (2) the trial court erred by imposing consecutive sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

J. Liddell Kirk (on appeal) and R. Alexander Brown (at trial), Knoxville, Tennessee, for the appellant, Gary Lee Bragg.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to two November 2015 home burglaries. At the trial, a November 23, 2015 recording of a 9-1-1 call regarding a home burglary on Iredell Avenue was played for the jury. In the recording, a male caller reported that his home had been "robbed" while he had been at work. The caller reported "forced entry" through a side door and stated that

his PlayStation 4, PlayStation 3, and a video game were missing, that he was unsure if anything else had been taken, and that a television had been moved.

A November 25, 2015 recording of 9-1-1 call regarding an apartment burglary on Gallaher View Road was played for the jury. In the recording, a female caller reported that someone had "broken into" a neighboring apartment. She stated that the men "busted in the door" and that the men were still inside the apartment. She said that she had never seen the men previously, that a tenant had to have a key to lock the door from the outside, and that, as a result, she did not think the men were tenants. The dispatcher stated that another tenant at the apartment complex had called 9-1-1, as well. She provided directions to the apartment and said the men were leaving the apartment. She remained on the line until police officers arrived and placed the men in custody.

Knoxville Police Officer Raiques Crump testified that he responded to the home on Iredell Avenue, that the homeowner stated the home had been burglarized, and that the homeowner showed him a side door that had been pried open. Officer Raiques said that the home had been "ransacked," that furniture had been moved, that clothes had been strewn about the home, and that someone had "torn up" the home. He said the homeowner reported that two PlayStation consoles and a video game had been taken from the home. Officer Raiques said that he contacted the forensics department and that someone attempted to obtain fingerprints from inside the home. On cross-examination, Officer Raiques stated that the homeowner only reported damage to the side door and did not mention a potential suspect.

Knoxville Police Officer David Gerlach testified that he and Officer McNutt responded to the apartment on Gallaher View Road and that he saw two men leaving the apartment where a burglary had been reported. Officer Gerlach said that he and Officer McNutt commanded the men to lie on the ground and that the men were placed in handcuffs. Officer Gerlach identified the Defendant and codefendant Iran Lyons as the men leaving the apartment and said that, when he searched the Defendant, he found a set of keys with a key fob. Officer Gerlach said that he activated the key fob, that the headlights of a car in the parking lot flashed, and that he called for a police dog unit to "conduct a sniff" of the car. Officer Gerlach said that the dog "did a passive alert" for the presence of narcotics, that the vehicle was searched, and that marijuana and Opana pills were found inside the center console, along with the Defendant's identification. Officer Gerlach said that four computers and a Kindle tablet were found on the back seat. Officer Gerlach said that the computers' serial numbers were entered into the NCIC database and that one of them had been reported stolen from the Iredell Avenue home.

Officer Gerlach testified that the front door to the apartment had been broken and that a pry bar was found on a sofa cushion inside the apartment. He said that two PlayStation

consoles had been disconnected and placed on the floor in the middle of the room, that the sofa had been overturned, that a loaded SKS assault rifle was behind the sofa, that the rifle contained thirty-seven live rounds, and that a .45-caliber Glock handgun was found "in the corner of the room." He said that the apartment had been ransacked and that a small bag of marijuana was found inside the apartment. He said the forensics department attempted to obtain fingerprints from inside the apartment. He identified various photographs showing the damage to the apartment door and the condition of the apartment when he arrived, and a video recording from his police car was played for the jury. He said that he did not find ammunition inside the apartment, other than the ammunition inside the loaded firearms.

On cross-examination, Officer Gerlach testified that no fingerprints were found on the firearms and that he did not know which other items inside the apartment were dusted for fingerprints. He said that the pry bar was dusted for fingerprints but that he did not know whether any were found. He said the Defendant and codefendant Lyons were not wearing gloves.

Frederick Dorsett testified that on November 23, 2015, he and his son lived at the home on Iredell Avenue. Mr. Dorsett said that when he returned home on November 25, the side door had been "kicked in" and that his son called the police. Mr. Dorsett said that two game consoles, a computer, "a little bit of money," and scratch-off lottery tickets had been taken from the home. He said the police returned his computer. He denied giving anyone permission to kick in his door and to enter his home. He said that he did not give the Defendant permission to be inside his home and to take his belongings.

On cross-examination, Mr. Dorsett testified that he did not know the Defendant but that his girlfriend's daughter and codefendant Lyons were friends. Mr. Dorsett said that codefendant Lyons' girlfriend lived nearby. Mr. Dorsett said that he did not "have any dealings with" codefendant Lyons. Mr. Dorsett said that the door lock and frame were damaged, that footprints were left on the door where it was kicked, and that based upon the markings it looked like the door had been pried open with a crowbar. He agreed the police attempted to obtain fingerprints from his television but that none were found. On redirect examination, Mr. Dorsett stated that he did not give codefendant Lyons permission to enter his home and to take his belongings.

Knoxville Police Department evidence technician Rebecca Taylor testified that she unsuccessfully attempted to obtain fingerprints inside Mr. Dorsett's home on Iredell Avenue. She said, though, that she found "glove prints," which indicated the perpetrators probably wore gloves.

Ariella Douglas testified that on November 25, 2015, she lived in the apartment located on Gallaher View Road. She said that she was getting ready to leave work when she received a telephone call from the police telling her that her apartment had been burglarized.

She said that her apartment had been "trashed" and that the rifle, the handgun, and the pry bar found inside her apartment did not belong to her. She identified a photograph of her living room and said that although the photograph showed the game consoles on the floor in the middle of the room, they were stored under the television stand. She denied that the guns and marijuana were inside the apartment when she left for work. She said that she did not give the Defendant and codefendant Lyons permission to enter her apartment.

On cross-examination, Ms. Douglas did not recall previously testifying that she drove to her grandmother's home before driving to the apartment on the night of November 25. She said that after the incident, her family retrieved her belongings from the apartment. She identified a photograph depicting three men, and she identified only her cousin, Ronnie McElwain, from the photograph. She said that Mr. McElwain, along with her younger cousins, periodically stayed overnight at her apartment. She said that, at the time of the incident, she lived at the apartment with her then-boyfriend and that she began moving her belongings out of the apartment before the incident because their relationship was ending. She knew Mr. McElwain had a criminal history, but she denied knowing the crime for which he had been convicted. She denied that her younger cousins and her former boyfriend had criminal histories.

Ms. Douglas testified that she had not been at the apartment for almost one week at the time of the incident. She denied that any of her cousins had keys to the apartment and said that she was at the apartment whenever her cousins were there. She clarified that after she spoke to the police officers at her apartment, she went to her grandmother's home. On redirect examination, she stated that her cousins, with the exception of Mr. McElwain, who stayed at her apartment were ages one, five, six, and seven. She stated that the clothes depicted in the apartment photographs belonged to her former boyfriend.

Miguel Martinez testified that he lived at the same apartment complex as Ms. Douglas and that he called 9-1-1 on the night of the incident. He said that he and his friend left his apartment to purchase dinner for their children and that he saw two African-American men on the second floor of the apartment building when they returned. Mr. Martinez recalled thinking the men might have been locked out of their apartment. Mr. Martinez said that he and his friend had to return to the restaurant because the order was incorrect and that as they were leaving, he saw that the apartment door where the men had been standing had been "busted into." Mr. Martinez said that he saw a man peeking out of the window. Mr. Martinez said that wood hung from the apartment door, that the door was not closed fully, and that he found this suspicious based upon his training in security. Mr. Martinez said that he parked his car in front of the apartment building, that he called "the property police," who did not answer, and that he called 9-1-1 and waited inside his car until the police arrived. He said that he pointed to the apartment when the officers arrived. Mr. Martinez said he did not see the men break into the apartment, only attempting to "jiggle something . . . to force the

door to . . . open." On cross-examination, Mr. Martinez stated that although he did not see the men's faces, he saw them inside the apartment and watched the men until the police arrived and took them into custody.

Knoxville Police Officer Roger McNutt testified that he responded to the incident on Gallaher View Road and that, before entering the apartment, he spoke to Mr. Martinez, who stated that the men were still inside the apartment. Officer McNutt stated that the Defendant and codefendant Lyons walked out of the apartment and that Officer Gerlach placed them in handcuffs.

Knoxville Police Officer Edward Johnson testified that he unsuccessfully attempted to obtain fingerprints from the firearms and the pry bar found inside Ms. Douglas' apartment. He did not attempt to obtain fingerprints from any additional items.

Certified copies of two judgments of conviction were received as an exhibit. The judgments reflected that, in November 2006, the Defendant had been convicted of the attempt to introduce contraband into a penal facility and that, in December 2009, the Defendant had been convicted of felony theft.

The Defendant testified that on the night of his arrest, he and codefendant Lyons went to the apartment complex to visits their friends, C.C. and Tonya. The Defendant said that nobody was at the apartment when they arrived and that, when they were leaving, they saw a police car pull into the parking lot. The Defendant said that codefendant Lyons had an outstanding arrest warrant. The Defendant said that initially they began to turn around and walk up the steps toward the apartment but that they decided to continue leaving because they had done nothing wrong. The Defendant said that, as they walked down the steps, the police officers "jumped out" with their firearms pointed at them and instructed them to lie on the ground. He said that the officers placed him under arrest, searched him, took his car keys, and placed him in the back of a police car. The Defendant denied knowing Ms. Douglas, Mr. McElwain, and Mr. Martinez and said that he and codefendant Lyons had been at the apartment for approximately ten to fifteen minutes before the police arrived.

On cross-examination, the Defendant testified that he never entered Ms. Douglas' apartment and that he never entered any apartment on the night of the incident. The Defendant said that he and codefendant Lyons knocked on the door of apartment 208 and that he did not pay attention to determine if anyone was attempting to break into Ms. Douglas' apartment. He did not recall seeing anyone run from Ms. Douglas' apartment and said that he and codefendant Lyons did nothing wrong. He denied knowing Ms. Douglas' former boyfriend.

The Defendant admitted that he owned the car in which the marijuana and Opana pills were found and that the marijuana and pills belonged to him. He admitted he was guilty of possessing controlled substances. He denied he was guilty of breaking into an apartment and possessing the firearms. He agreed that the laptop computers found inside his car did not belong to him and that one of the computers belonged to Mr. Dorsett. The Defendant said that he did not know Mr. Dorsett and that he bought all of the laptops "off the street from somebody." The Defendant referred to the seller as "a crackhead" and as "Jim[] from the east side." The Defendant said he bought the computer as a Christmas gift about two weeks before his arrest.

The Defendant testified that his fingerprints were not found on anything inside Ms. Douglas' apartment and that he did not have gloves or her property in his possession at the time of his arrest. He did not dispute the accuracy of the judgments previously received as an exhibit showing his previous convictions and agreed that he had five previous federal convictions for offenses involving cocaine. He also agreed that he had previous convictions for misdemeanor theft and stated that he pleaded guilty in his previous cases to take responsibility for his conduct. He denied being guilty of the present aggravated burglary and firearm charges.

Upon this evidence, the jury found the Defendant guilty of two counts of aggravated burglary, possession of burglary tools, and two counts of drug possession. The jury acquitted the Defendant of possession of a firearm during the commission of a dangerous felony and possession of a handgun by a convicted felon. The trial court imposed an effective twenty-four-year sentence. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction for the aggravated burglary of the Iredell Avenue home. He argues that although Mr. Dorsett's computer was found inside his car, this evidence is insufficient to establish he entered Mr. Dorsett's home. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676

S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to the present case, aggravated burglary is defined as "burglary of a habitation[.]" T.C.A. § 39-14-403(a). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft, or assault[.]" *Id*. § 39-14-402(a)(1) (2018). Habitation is defined as "any structure . . . designed or adapted for the overnight accommodation of persons[.]" *Id*. § 39-14-401(1)(A) (2018). Owner is "a person in lawful possession of property whether the possession is actual or constructive." *Id*. § 39-14-401(3). A jury is permitted to infer that a person who possesses recently stolen property obtained the property through theft, unless the possession of the property is satisfactorily explained. *State v. James*, 315 S.W.3d 440, 450 (Tenn. 2010). However, the inference that a burglary occurred is only permitted when "there exists a rational connection between possession and participation, when guilt [of burglary] more likely than not flows from possession, and importantly, when there is some other evidence corroborating the burglary that warrants the inference." *Id*. at 452; *see State v. Foust*, 482 S.W.3d 20, 54-55 (Tenn. Crim. App. 2015).

In the light most favorable to the State, the evidence shows that on November 23, Mr. Dorsett returned to his home on Iredell Avenue to find that the side door had been "kicked in" or "pried open" and that several items, including a computer, had been taken from the home. Mr. Dorsett testified that he did not give anyone permission to enter his home and to take his belongings. Two days later, on November 25, the Defendant and codefendant Lyons were seen inside Ms. Douglas' apartment on Gallaher View Road. Mr. Martinez called the police when he saw damage to Ms. Douglas' apartment door and a man peeking out of a window from inside the apartment. Mr. Martinez remained at the scene watching the men until the police arrived, and he directed the responding officers to Ms. Douglas' apartment. Officer Gerlach saw the Defendant and codefendant Lyons leaving the apartment and took them into custody. Upon investigating, Mr. Dorsett's computer was found inside the Defendant's car. Ms. Douglas' apartment, like Mr. Dorsett's home, had been ransacked, and the police found a pry bar inside. The pry bar did not belong to Ms. Douglas.

The Defendant was apprehended during the commission of the aggravated burglary of

-7-

Ms. Douglas' apartment, which occurred two days after the aggravated burglary of Mr. Dorsett's home. Possession of Mr. Dorsett's stolen computer, without a satisfactory explanation for the possession, permitted the jury to infer that the Defendant obtained the property through a burglary. At the trial, the Defendant admitted that Mr. Dorsett's computer was found inside the Defendant's car and testified that he bought the computer about two weeks before his arrest and before the burglary at Mr. Dorsett's home from someone he referred to as Jim. The jury considered the Defendant's explanation for his possession of the stolen property, and the verdict reflects that it discredited the Defendant's testimony. The evidence is sufficient to support the conviction, and the Defendant is not entitled to relief on this issue.

## II. Sentencing

The Defendant contends that the trial court improperly ordered consecutive service of the aggravated burglary sentences. The Defendant argues that because he was a Range III offender, consecutive service rendered his effective twenty-four-year sentence excessive. The State responds that the court did not abuse its discretion by imposing consecutive service. We agree with the State.

At the sentencing hearing, the presentence report was received as an exhibit. The report reflected that the thirty-three-year-old Defendant had previous convictions for five counts of driving when his license was suspended or revoked, two counts of failure to present a driver's license upon demand, five counts of evading arrest, misdemeanor theft, felony theft, five counts of misdemeanor drug possession, attempted introduction of contraband into a penal facility, misdemeanor failure to appear, and criminal trespass. The Defendant had drug-related felony convictions from federal court. The Defendant had previous juvenile adjudications for failure to present a driver's license upon demand, evading arrest, theft, driving when his license was suspended or revoked, casual exchange, criminal impersonation, and two counts of "violation of aftercare."

The presentence report reflected that at the time of the sentencing hearing, the Defendant had a pending probation violation matter related to his federal convictions. The Defendant reported completing the eighth grade and leaving school in the ninth grade because he "went to the streets." He stated that he had not obtained a GED. He reported that he first drank alcohol at age fourteen or fifteen and that, since age seventeen, he drank alcohol once or twice per week. He stated that he first used marijuana at age fifteen, that he used it daily by age sixteen or seventeen, and that he last used it in 2015. He said that he used Xanax weekly for several months during his late teens. He stated that he completed a drug treatment program as a teenager after violating his probation for using marijuana. He reported having excellent mental and physical health and having previous employment at Skyco Staffing.

Certified copies of judgments of conviction from federal court were received as an exhibit and showed that in 2009 the Defendant was convicted of two counts of possession with the intent to distribute cocaine base and three counts of possession with the intent to distribute more than five grams of cocaine base. The Defendant received concurrent sentences of seventy-two months for each conviction. Certified copies of Knox County judgments of conviction were received as exhibits and reflected that in 2009 the Defendant was convicted of felony theft and that in 2006 he was convicted of attempted introduction of contraband into a penal facility. Certified copies of judgments of conviction for misdemeanor convictions were received as an exhibit and reflected that the Defendant was convicted of five counts of evading arrest, shoplifting, driving when his license was revoked, and drug possession. The judgments reflected two probation revocations related to his evading arrest convictions.

The trial court determined that the Defendant was a Range III offender. The trial court found that enhancement factor (1) applied because the Defendant had fourteen previous misdemeanor and felony convictions, in addition to his convictions in federal court. *See* T.C.A. § 40-35-114(1) (2014) (subsequently amended) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court applied enhancement factor (8) based upon the Defendant's previous probation violations and revocations. *See id.* § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"). Likewise the court applied enhancement factor (13) because the Defendant was on federal probation at the time he committed the present offenses. *See id*. § 40-35-114(13) ("At the time the felony was committed . . . the defendant . . . [was] released on probation[.]").

The trial court imposed twelve-year sentences for each aggravated burglary conviction and eleven months, twenty-nine days for each misdemeanor conviction. Relative to consecutive service, the court determined that the Defendant had devoted a "major portion of his life to criminal acts as a source of livelihood." *See id.* § 40-35-115(b)(1) ("The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood[.]"). The court, likewise, found that the Defendant had an extensive history of criminal activity. *See id*. § 40-35-115(b)(2) ("The defendant is an offender whose record of criminal activity is extensive[.]"). The court found that the Defendant was on probation at the time he committed the present offenses. *See id*. § 40-35-115(b)(6) ("The defendant is sentenced for an offense committed while on probation[.]"). As a result, the court ordered the twelve-year sentences to be served consecutively to each other and to the sentence for which he received federal probation.

This court reviews challenges to the length of a sentence within the appropriate

sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

For his Class C felony convictions, the Defendant faced sentences of ten to fifteen years as a Range III offender for each offense. *See* T.C.A. 40-35-112(c)(3) (2014). The trial court imposed mid-range sentences of twelve years for each conviction, and the court relied upon three statutory factors in ordering consecutive service. The record supports the court's finding that the Defendant's criminal history was extensive, that he was on probation at the time of the present offenses, and that he was a professional criminal who devoted his life to crime as a major source of livelihood. *See id.* § 40-35-115(b)(1), (2), (6). The presentence report and the certified copies of the judgments of conviction reflect that the Defendant had an extensive history of criminal activity, which began when he was a juvenile, and that he only reported one previous employer, although he was age thirty-three at the time of the presentence investigation. The presentence report and the judgments of convictions reflect that the Defendant was serving a sentence on supervised release for multiple federal drug-related convictions at the time of the present offenses. The record supports the trial court's decision to impose consecutive service of the twelve-year sentences. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE